UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK



_____

CONSTANCE J. NEUBECKER,

        Plaintiff,

      v.

NEW YORK STATE, STATE UNIVERSITY
OF NEW YORK, ERIE COMMUNITY
COLLEGE,

        Defendant.

_____

**DECISION AND ORDER**

1:15-CV-00614 EAW

## INTRODUCTION

Plaintiff Constance Neubecker ("Plaintiff") commenced this action against Defendant Erie Community College ("ECC" or "Defendant")[1] on July 10, 2015, asserting violations of Title VII of the 1964 Civil Rights Act, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), the Equal Pay Act, as amended, 29 U.S.C. § 206(d) (the "EPA"), and the Lilly Ledbetter Fair Pay Act, 42 U.S.C. § 2000e-5 (the "Ledbetter Act"). (Dkt. 1). Presently before the Court is Defendant's motion for summary judgment. (Dkt. 37). For the reasons that follow, Defendant's motion is granted in part and denied in part.

---

[1]    The caption of Plaintiff's complaint identifies "New York State, State University of New York, Erie Community College" as the defendant. (*See* Dkt. 1 at 1). The substance of the complaint makes it clear that Plaintiff is suing only ECC, and not the State of New York or the State University of New York separately. (*See id.* at ¶ 2).

# BACKGROUND

## I.  Procedural Background

Prior to commencing the instant action, Plaintiff, a female employee of ECC, filed a charge with the Equal Employment Opportunity Commission ("EEOC") on August 7, 2012, alleging discrimination on the basis of her gender and unlawful retaliation for her prior complaints of discrimination. (Dkt. 37-6 at 1).[2] On July 31, 2014, the EEOC issued a probable cause finding. (Dkt. 53-4 at 2-4).

On July 10, 2015, Plaintiff commenced the instant action, asserting violations of Title VII, the EPA, and the Ledbetter Act. (Dkt. 1). Defendant filed an answer to Plaintiff's complaint on October 29, 2015. (Dkt. 6). As confirmed on the record at oral argument, Plaintiff now seeks to voluntarily dismiss her EPA and Ledbetter Act claims. (*See* Dkt. 53 at 23). Plaintiff's Title VII allegations of gender discrimination, hostile work environment, unlawful retaliation, and pay discrimination remain at issue.

On August 8, 2017, Defendant moved for summary judgment. (Dkt. 37). Defendant filed an amended memorandum in support of its motion and an amended Rule 56 statement of undisputed facts on September 14, 2017. (Dkt. 42). Plaintiff filed her opposition to the motion on January 8, 2018 (Dkt. 53), and Defendant replied in support of the motion on January 25, 2018 (Dkt. 56). Oral argument on Defendant's motion for

---

[2]     Plaintiff apparently filed multiple charges with the EEOC (*see* Dkt. 53-4 at 2), but the parties confirmed at oral argument that the operative EEOC charge, for purposes of this action, is the one filed on August 7, 2012. Copies of Plaintiff's prior EEOC charges are not in the record before the Court.

summary judgment was held before the undersigned on May 24, 2018. (Dkt. 60). The Court reserved decision.

## II. **Factual Background**

The following facts are taken from Defendant's Statement of Material Facts Not in Dispute (Dkt. 42-1) ("Def. Stmt."), Plaintiff's response thereto (Dkt. 53-1) ("Pl. Stmt."), and the exhibits submitted by the parties (Dkt. 37-1; Dkt. 37-2; Dkt. 37-3; Dkt. 37-4; Dkt. 37-5; Dkt. 37-6; Dkt. 53-2; Dkt. 53-3; Dkt. 53-4; Dkt. 56-1; Dkt. 56-2). The facts set forth below are undisputed, unless otherwise noted.

Plaintiff began working for ECC on April 4, 1985, as a laborer. (Def. Stmt at ¶ 1; Pl. Stmt. at ¶ 1). Plaintiff became a truck driver for ECC in August 1999. (Def. Stmt. at ¶ 1; Pl. Stmt. at ¶ 1). As a truck driver, Gary Goshen ("Goshen"), ECC's head custodian, was Plaintiff's direct supervisor. (Def. Stmt. at ¶ 1; Pl. Stmt. at ¶ 1). Goshen in turn reported to Anthony Nesci ("Nesci"), ECC's Director of Buildings and Grounds. (Def. Stmt. at ¶ 1; Pl. Stmt. at ¶ 1).

### A. **Complaint Against Ronnie Moore**

On May 10, 2011, Plaintiff submitted a letter to Defendant's then-Director of Equity and Diversity, Darley Willis ("Willis"), complaining of alleged harassment by co-worker Ronnie Moore ("Moore"), a truck driver. (Def. Stmt. at ¶ 9; Pl. Stmt. at ¶ 9). At her deposition, Plaintiff testified that she was "set up" and "given misinformation" that caused her to file this complaint. (Dkt. 37-6 at 47). In particular, Plaintiff testified that other co-workers had told her Moore had stated she could not do her job. (*Id.* at 48). However, Plaintiff never personally heard Moore make such statements (*id.*), and she

admits she never heard Moore say anything derogatory about her gender, nor did she ever discuss her complaints with Moore (Def. Stmt. at ¶ 11; Pl. Stmt. at ¶ 11). Nonetheless, Plaintiff never withdrew her complaint against Moore. (Def. Stmt. at ¶ 11; Pl. Stmt. at ¶ 11).

Willis investigated Plaintiff's complaint and sent a memorandum to staff directing them not to communicate with Plaintiff about her complaint. (Def. Stmt. at ¶¶ 12, 14; Pl. Stmt. at ¶¶ 12, 14). After completing the investigation, Willis sent a letter to Plaintiff stating that she had concluded that the "staff's conduct does not rise to the level of actionable harassment." (Def. Stmt. at ¶¶ 16, 17; Pl. Stmt. at ¶¶ 16, 17). The letter also stated that Plaintiff was "protected from any form of retaliation for having filed this complaint." (Def. Stmt. at ¶ 17; Pl. Stmt. at ¶ 17). Willis communicated to Plaintiff's co-workers that ECC prohibits retaliation for the filing of complaints. (Def. Stmt. at ¶ 18; Pl. Stmt. at ¶ 18).

On June 23, 2011, Willis met with the maintenance staff and informed them of Plaintiff's harassment complaint. (Dkt. 53-4 at 6). Willis instructed the staff not to have any conversations about Plaintiff's work performance and not to discuss the complaint. (*Id.*). In Plaintiff's timeline of events, included in her summary judgment exhibits, Plaintiff alleges that the day after Willis' visit, Plaintiff's co-workers openly mocked her in the break room. (*Id.* at 38). Plaintiff felt threatened and left work early, forgetting to sign out. (*Id.*). When she returned to work a few days later, she was served with a notice stating that she had violated ECC work rules by failing to sign out and that a note would be included in her file. (*Id.*).

## B. Complaints Against Sean Kelly

On September 16, 2011, Plaintiff emailed Willis informing her that co-worker Sean Kelly ("Kelly") was refusing to work with her. (Def. Stmt. at ¶ 19; Pl. Stmt. at ¶ 19). Plaintiff also complained that when she informed Anthony Vitali ("Vitali"), the Supervising Maintenance Mechanic, about her negative interactions with Kelly, Vitali yelled at Plaintiff to the point where Plaintiff felt ill and had to leave work. (Dkt. 53-4 at 10). Plaintiff told Vitali during this conversation that she felt she was being treated as a second-class citizen. (*Id.*). Willis later met separately with Plaintiff and Kelly about Plaintiff's complaint. (Def. Stmt. at ¶¶ 21-23; Pl. Stmt. at ¶¶ 21-23).

Over a year later, on November 14, 2012, Plaintiff emailed Goshen, Nesci, and Willis stating that Kelly called her a "bitch" at work in front of her co-workers. (Def. Stmt. at ¶ 24; Pl. Stmt. at ¶ 24). Plaintiff provided Willis with a list of seven witnesses to the incident. (Def. Stmt. at ¶ 26; Pl. Stmt. at ¶ 26). On November 30, 2012, Plaintiff, Willis, Kelly, Goshen, and Moore met to discuss Plaintiff's complaint. (Def. Stmt. at ¶ 27; Pl. Stmt. at ¶ 27). Thereafter, on December 21, 2012, Willis sent a memo to Kelly concluding her investigation. (Def. Stmt. at ¶ 29; Pl. Stmt. at ¶ 29). Willis' memo, a copy of which was provided to Plaintiff, recommended that Kelly receive disciplinary action. (Def. Stmt. at ¶ 29; Pl. Stmt. at ¶ 29). Kelly was further instructed not to speak with Plaintiff other than for work-related reasons. (Def. Stmt. at ¶ 30; Pl. Stmt. at ¶ 30).

Plaintiff testified, during her deposition, that after December 21, 2012, Kelly was hostile to her on a daily basis. (Dkt. 37-6 at 59). She testified that he was condescending to her, counted the number of times she used the restroom and commented on it, and

constantly demeaned her. (*Id.* at 59-63). However, there is no evidence indicating that Plaintiff complained about Kelly's behavior after December 21, 2012, and Plaintiff admitted that she had no recollection of having done so. (Def. Stmt. at ¶ 32; Pl. Stmt. at ¶ 32).

## C. Application for Head Gardener Position

On September 28, 2011, Plaintiff applied for the position of head gardener at ECC. (Def. Stmt. at ¶ 35; Pl. Stmt. at ¶ 35). Plaintiff did not provide a copy of her pesticide applicator license, nor did she note she had such license in her application or résumé. (Def. Stmt. at ¶ 38; Pl. Stmt. at ¶ 38). On March 6, 2012, Eileen P. Flaherty ("Flaherty"), ECC's then-Director of Human Resources, sent Plaintiff a letter indicating that her application had been reviewed and that the appointments committee had determined Plaintiff did not meet the specific qualifications for the head gardener position. (Dkt. 37-4 at 102).

Karl Anderson ("Anderson") was selected by ECC for the head gardener position. (Def. Stmt. at ¶ 36; Pl. Stmt. at ¶ 36). Anderson attached his pesticide technical certification to his application and referred to it on his résumé. (Def. Stmt. at ¶ 36; Pl. Stmt. at ¶ 36). Three other male applicants were also evaluated and found not qualified for the position. (Def. Stmt. at ¶ 37; Pl. Stmt. at ¶ 37).

Plaintiff filed a grievance with her union regarding her rejection for the head gardener position. (Def. Stmt. at ¶ 39; Pl. Stmt. at ¶ 39). The union denied her grievance on the basis that she "was deemed not qualified for the position" because her application failed to show that she met the minimum qualifications therefor. (Dkt. 37-4 at 105).

## D.    Failure to Train Allegations

Plaintiff also alleges that she was denied the opportunity to be trained, upgraded, and promoted, while others were given the opportunity to learn additional skills. (Dkt. 1 at ¶ 24). The parties contest the facts regarding this issue. Defendant contends that ECC offers employees the opportunity to receive additional education with a tuition waiver, but that Plaintiff never applied for or availed herself of that opportunity. (Def. Stmt. at ¶ 53). Plaintiff states that she was never informed of that opportunity, and that she specifically asked to be put in a position where she could learn with the tradesmen. (Pl. Stmt. at ¶ 53). However, somewhat contradictorily, Plaintiff also claims that the only training that was ever offered was pesticide training, for which she volunteered. (*Id.*).

## E.    Retaliation Allegations

Plaintiff asserts a claim for retaliation. In support of that claim, she has identified various actions by ECC and its employees that she contends were retaliatory. As noted above, Plaintiff maintains that after she made her complaint against Moore in 2011, her co-workers openly mocked her. (Dkt. 53-4 at 38). Plaintiff also claims that in December 2011, Goshen forced her to move her desk into the garage, where there were mice present. (*Id.* at 39). When she complained about the mice, Goshen refused to speak with Plaintiff without her supervisor present. (*Id.*). Plaintiff claims she emailed Nesci to ask why Goshen would not speak to her when he would speak to other employees, but Nesci never replied. (*Id.*).

Furthermore, Plaintiff contends that she was deliberately given difficult, labor intensive tasks, while her male co-workers were given non-labor intensive, machine-

based job assignments. (*See* Dkt. 1 at ¶ 52). The record includes work orders for assignments given to Plaintiff. (Dkt. 53-4 at 14-18). On November 2, 2011, Plaintiff received a weekly standing work order stating that Plaintiff and the "garage crew are responsible to clean/sweep and organize the garage area and the garage equipment." (*Id.* at 14). On December 1, 2011, a work order requested that Plaintiff "and garage," "[o]n days when there is extra time, utilize the time by working on cleaning up the library basement." (*Id.* at 16). On May 8, 2012, Plaintiff received a work order stating that the "sterilizer on [the] loading dock needs to be moved to . . . the dental hygiene clinic. It is very heavy and will need to be placed on a rack at least 3 feet high. It may be helpful to remove outer shipping materials. Two strong men have lifted it before." (*Id.* at 18). This work order states that it is assigned to Plaintiff "[plus] garage." (*Id.*). In an email from Plaintiff to her supervisor sent on May 7, 2012, Plaintiff complained that she had been asked to clean up certain flower beds in a two-week time period. (*Id.* at 28). Plaintiff stated that it would take much longer than two weeks to complete the task. (*Id.*).

F.    **Pay Discrimination Allegations**

Plaintiff contends that she was not paid equally to her male counterparts. Plaintiff's truck driver position was classified as a Grade 4 position for purposes of compensation and other benefits. (Def. Stmt. at ¶ 42; Pl. Stmt. at ¶ 42). However, ECC employees are sometimes required to work down to a lower job grade, because work is assigned to whichever employee is available at the discretion of a supervisor. (Def. Stmt. at ¶ 41; Pl. Stmt. at ¶ 41).

Additionally, according to Defendant, depending on the financial resources and workload needs of ECC, Nesci may determine that a truck driver shall receive "out-of-title" or "variance" pay that is granted as a pay upgrade to perform "higher" duties that are not in the truck driver's job description. (Def. Stmt. at ¶ 43). Defendant contends that the awarding of this kind of variance pay is not governed by the Collective Bargaining Agreement ("CBA") related to Plaintiff's employment with ECC, but Plaintiff disagrees. (Def. Stmt. at ¶ 44; Pl. Stmt. at ¶ 44). She notes that the CBA provides that "[t]he Employer shall give employees preferential selection by seniority in available job assignments where and when in its sole and exclusive discretion it seems practicable." (Pl. Stmt. at ¶ 43; Dkt. 53-4 at 42).

In January and February 2012, two male truck drivers received Grade 7 variance pay. (Dkt. 37-4 at 128-130). In March 2012, Plaintiff received Grade 7 variance pay, which continued for several years. (Def. Stmt. at ¶ 49; Pl. Stmt. at ¶ 49). The less senior male employees whom Plaintiff alleges were promoted to Grade 7 pay, in fact, like Plaintiff, received a variance for performing out-of-title work. (Def. Stmt. at ¶ 50; Pl. Stmt. at ¶ 50).

## DISCUSSION

### I. Standard of Review for Motion for Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court should grant summary judgment if, after considering the evidence in

the light most favorable to the nonmoving party, the court finds that no rational jury could find in favor of that party. *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec.*, 475 U.S. at 586-87). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

## II.    Title VII Gender Discrimination Claims

### A.    Legal Standard

Discrimination claims under Title VII are governed by a three-step burden shifting analysis. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *see also Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 106-07 (2d Cir. 2010). Plaintiff bears the initial burden of proving a *prima facie* case of discrimination by a preponderance of the evidence. To establish a *prima facie* case of gender discrimination under Title VII, the plaintiff must prove that: (1) she was within the protected class; (2) she was qualified for the position and was satisfactorily performing her duties; (3) she was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination. *See Terry v. Ashcroft*, 336 F.3d 128, 137-38 (2d Cir. 2003); *Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 253 (E.D.N.Y.

2012), *aff'd*, 713 F.3d 163 (2d Cir. 2013). Although "[a] plaintiff's burden of establishing a *prima facie* case is *de minimis*" at the summary judgment stage, *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 467 (2d Cir. 2001), "[a] jury cannot infer discrimination from thin air," *Ikejiaku v. Rochester City Sch. Dist.*, No. 07-CV-6191, 2011 WL 1099131, at *5 (W.D.N.Y. Mar. 22, 2011) (quoting *Norton v. Sam's Club*, 145 F.3d 114 (2d Cir 1998)).

To demonstrate that she suffered an adverse employment action, Plaintiff must show a "materially adverse change in the terms and conditions of employment." *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (internal quotation marks omitted). The change must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Terry*, 336 F.3d at 138 (internal quotation omitted). Adverse employment actions include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." *Id.* (quotation omitted and alteration in original). "[C]ourts in this circuit have found that reprimands, threats of disciplinary action and excessive scrutiny do not constitute adverse employment actions in the absence of other negative results such as a decrease in pay or being placed on probation." *Uddin v. City of New York*, 427 F. Supp. 2d 414, 429 (S.D.N.Y. 2006) (internal quotation omitted). Nor does an undesirable job assignment constitute an adverse action if the assignment does not "radically change" the nature of the work. *Potash v. Fla. Union Free Sch. Dist.*, 972 F. Supp. 2d 557, 584 (S.D.N.Y. 2013).

Inadequate training may constitute an adverse employment action, "but only in circumstances where an employer denies necessary job training to an employee and the terms and conditions of his employment are thereby harmed." *Carpenter v. City of Mount Vernon*, 198 F. Supp. 3d 272, 280 (S.D.N.Y. 2016). A denial of training that "affects the employee's opportunities for career growth or the employee's compensation[,] . . . such as failure to promote or loss of career advancement opportunities," can demonstrate the requisite material harm. *Id.*

After the plaintiff has established a *prima facie* case of gender discrimination, the burden then shifts to the employer to articulate "some legitimate nondiscriminatory reason" for the disparate treatment. *McDonnell Douglas*, 411 U.S. at 802. If the employer articulates such reason, the burden shifts back to the plaintiff to prove that the employer's reason "was in fact pretext" for discrimination. *Id.* at 804; *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 83 (2d Cir. 2015).

**B.    Limitations Period**

"Title VII requires that individuals aggrieved by acts of discrimination file a charge with the EEOC within 180 or, in states like New York that have local administrative mechanisms for pursuing discrimination claims, 300 days 'after the alleged unlawful employment practice occurred.'" *Vega.*, 801 F.3d at 78-79 (quoting 42 U.S.C. § 2000e-5(e)(1)). In *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), the Supreme Court explained that the word "practice" in the statute refers to "a discrete act or single 'occurrence,' even when it has a connection to other acts." *Id.* at 111. Thus, "discrete discriminatory acts are not actionable if time barred, even when they are related

to acts alleged in timely filed charges." *Id.* at 113. However, "claims tied to discrete acts in an ongoing adverse employment action that occurred within the limitations period are not time-barred," *Vega*, 801 F.3d at 79, even if the ongoing pattern of discrimination began outside the statutory period, *id.*

In this case, Plaintiff filed her EEOC charge on August 7, 2012. (Dkt. 1 at ¶ 46). Defendant argues that all of Plaintiff's allegations that occurred before October 12, 2011, are time-barred. (Dkt. 42 at 15). Plaintiff has offered no substantive opposition to this argument. The Court agrees with Defendant that Plaintiff's allegations of discrete discriminatory acts occurring prior to October 12, 2011, are untimely. Therefore, the Court has not relied upon any such untimely allegations in considering the viability of Plaintiff's claims.

### C.    Alleged Adverse Actions

### 1.    Rejection for Head Gardener Position

Plaintiff claims that her application for the head gardener position was rejected on the basis of her gender. "To make a *prima facie* case with respect to a failure-to-promote claim, Plaintiff must show that (1) [s]he is a member of a protected class; (2) [s]he was qualified for the position for which the employer was seeking applications; (3) [s]he was rejected for the position; and (4) this adverse action took place under circumstances giving rise to an inference of discrimination." *Anyanwu v. City of New York*, No. 10 CIV. 8498 AJN THK, 2013 WL 5193990, at *11 (S.D.N.Y. Sept. 16, 2013) (citing *Mandell v. Cty. of Suffolk*, 316 F.3d 368, 377 (2d Cir. 2003)). In support of its motion for summary judgment, Defendant argues that although Plaintiff's allegation that she was not selected

for the head gardener position constitutes an adverse employment action, she has not alleged a *prima facie* case of discrimination on that basis. (Dkt. 42 at 23). Defendant contends that Plaintiff has put forth no evidence of circumstances giving rise to an inference of discrimination, noting that it is undisputed that three male applicants were also found unqualified and rejected from the position. (*See* Def. Stmt. at ¶ 37; Pl. Stmt. at ¶ 37). Defendant further argues that, even if Plaintiff had established a *prima facie* case of discrimination, Defendant has put forth a legitimate, non-discriminatory reason that Plaintiff was not selected for the head gardener position, because the individual who was hired attached his pesticide technician certification to his application and referenced the license in his résumé. Plaintiff, on the other hand, did not provide a copy of her pesticide applicator certification or note that she possessed such a license on her application or in her résumé. (*See* Def. Stmt. at ¶ 38; Pl. Stmt. at ¶ 38).

The Court agrees that there is no genuine issue of material fact with respect to whether Plaintiff was denied the position of head gardener on the basis of her gender. As an initial matter, Defendant is correct that Plaintiff has failed to identify any circumstances to support an inference of discrimination. "An inference of discrimination can be drawn from circumstances including actions or remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus, or preferential treatment given to employees outside the protected class." *Salas v. N.Y.C. Dep't of Investigation*, 298 F. Supp. 3d 676, 687 (S.D.N.Y. 2018) (internal quotation omitted). While "there is no unbending or rigid rule about what circumstances allow an inference of discrimination when there is an adverse employment decision, employees must provide at least minimal

support for the proposition that the employer was motivated by discriminatory intent." *Id.* (internal citations and quotations omitted).

Here, Plaintiff has failed to produce any evidence from which a rational jury could conclude that the rejection of her application was motivated by unlawful discriminatory animus. There is nothing in the record to suggest that any decisionmakers regarding the head gardener position made any statements or took any actions that would demonstrate discriminatory evidence. Indeed, other than a reference to the "appointments committee" in Flaherty's letter, the record fails to identify the decisionmakers. The record also does not show preferential treatment having been given to individuals outside the protected class. To the contrary, Plaintiff acknowledges that three male individuals were also determined to be unqualified for the head gardener position. Plaintiff cannot show circumstances to support an inference of discrimination and therefore cannot make out a *prima facie* case of discrimination.

Moreover, Defendant has put forth a non-discriminatory reason for denying Plaintiff the head gardener position, and Plaintiff has failed to establish that there is an issue of material fact with respect to whether that reason was pretextual. As discussed above, Anderson, the individual who was selected for the head gardener position, attached to his application documentation showing that he was certified by the New York State Department of Environmental Conservation as a pesticide technician. (Dkt. 37-4 at 60). Anderson also noted this certification in his résumé. (*Id.* at 58). Plaintiff, on the other hand, admittedly did not include a copy of her pesticide applicator certification with her application, and her résumé makes no mention of it either. (*Id.* at 90).

Plaintiff argues that ECC should have known that she was a certified pesticide applicator, despite the fact that she failed to state as such in her application. However, Defendant has submitted documentation indicating that at ECC, "Human Resources and hiring committees can only consider qualifications and materials either submitted to HR with the application, or present in the personnel file and referred to on the application. . . . It is the applicant's responsibility to submit or draw attention to their own qualifications when they apply to a job at ECC." (*Id.* at 103). Plaintiff has failed to identify or produce any evidence to demonstrate that ECC, in fact, considered materials outside the application with respect to any other candidate. On these facts, no reasonable jury could conclude that Defendant's stated reason for hiring Anderson as head gardener over Plaintiff was a pretext for gender discrimination. Accordingly, Defendant is entitled to summary judgment with respect to Plaintiff's claim that she was denied the head gardener position on the basis of her gender. *See El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010) (affirming grant of summary judgment and noting that "a plaintiff must come forward with some evidence of pretext in order to raise a triable issue of fact").

## 2.    **Denial of Training**

Turning to Plaintiff's claim that she was denied opportunities for additional job training on the basis of her gender, Defendant argues that the record shows that Plaintiff was not in fact denied any such opportunities and that, even assuming she had been, she did not suffer material harm from any such denial. (Dkt. 42 at 19). The Court agrees that Plaintiff has failed to identify evidence from which a reasonable jury could conclude she

had been denied training. The evidence of record demonstrates that ECC offers employees the opportunity to receive education in building trades (which Defendant does not define) with a tuition waiver, but Plaintiff never applied for or availed herself of that opportunity. (*See* Dkt. 37-1 at ¶ 18). Plaintiff does not dispute that she never applied for additional training, but rather states that she was never informed of the tuition waiver policy. (Pl. Stmt. at ¶ 53). Furthermore, Plaintiff acknowledged at her deposition that she never asked to learn electrical work and does not remember whether she asked to learn carpentry skills. (Dkt. 37-6 at 46-47). While Plaintiff also stated during her deposition that she "asked to be put in a position where [she] could learn with the tradesmen, like the other gentlemen were doing, to get myself in line for a promotion" (*id.* at 47), she failed to provide any additional detail regarding this request, such as when and to whom it was made, or the identity of the "other gentlemen" who were allegedly receiving training.

Allegations of a denial of training that are "vague and unsupported" are insufficient to defeat a motion for summary judgment. *Rodriguez v. Long Island Am. Water, Inc.*, No. 12-CV-2970 JFB ARL, 2014 WL 4805021, at \*14 (E.D.N.Y. Sept. 26, 2014). Moreover, and as Defendant correctly points out, "[w]hen an employee cannot show material harm from a denial of training, such as a failure to promote or a loss of career advancement opportunities, there is no adverse employment action." *Hill v. Rayboy-Brauestein*, 467 F. Supp. 2d 336, 352 (S.D.N.Y. 2006). In this case, Plaintiff has failed to identify any specific training she was denied or any specific promotions or career advancement opportunities that were unavailable to her because she had allegedly

not been trained. Plaintiff's vague allegations that she was not afforded training opportunities are insufficient to support a gender discrimination claim. *See id.* at 354 (summary judgment was appropriate where there was "no evidence that [the plaintiff] suffered a loss of pay, a change in responsibility, or any other adverse employment action because of her allegedly inadequate training"). For the foregoing reasons, the Court grants summary judgment to Defendant with respect to Plaintiff's claim that she was unlawfully denied training on the basis of her gender.

## II.    Hostile Work Environment

Plaintiff also claims that she was subjected to a hostile work environment. "[T]o prevail on a hostile work environment claim under Title VII, a plaintiff must make a *prima facie* showing that her workplace was permeated with 'discriminatory intimidation, ridicule, and insult . . . sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' and show a specific basis for imputing the conduct that created the hostile work environment to her employer." *McCullough v. Xerox Corp.*, 942 F. Supp. 2d 380, 385 (W.D.N.Y. 2013) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). "The test for hostile work environment has both an objective and a subjective component: A work environment will be considered hostile if a reasonable person would have found it to be so and if the plaintiff subjectively so perceived it." *Mormol v. Costco Wholesale Corp.*, 364 F.3d 54, 58 (2d Cir. 2004) (internal quotation marks omitted).

> Whether a reasonable person would find a given work environment to be hostile depends on the totality of the circumstances; [c]onsiderations include: (1) the frequency of the conduct, (2) the severity of the conduct,

(3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance, and (4) whether the conduct unreasonably interferes with the employee's work performance.

*Id.* (internal quotation omitted). Summary judgment on a hostile work environment claim is only appropriate if the Court concludes "as a matter of law that no rational juror could view [the defendant's] conduct as . . . an intolerable alteration of [the plaintiff's] working conditions." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 75 (2d Cir. 2001) (quotation omitted and alterations in original).

In assessing whether there is a basis for imputing the harassing conduct to the employer, the Supreme Court has held that "an employer's liability for [workplace] harassment may depend on the status of the harasser." *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013). "If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions. In cases in which the harasser is a 'supervisor,' however, different rules apply." *Id.*

In support of its motion for summary judgment, Defendant argues that the alleged conduct in this case was not severe or pervasive. (Dkt. 42 at 29). Defendant contends that, at worst, Plaintiff has alleged petty workplace grievances and personality conflicts that almost all workers experience. (*Id.* at 31). Defendant further argues that there is no basis for imputing any allegedly harassing conduct by Plaintiff's co-workers to ECC. (*Id.* at 32-34).

The Court finds that Defendant is entitled to summary judgment on Plaintiff's hostile work environment claim. As an initial matter, the Court notes that Plaintiff's allegations regarding Moore are time-barred and cannot form the basis for a hostile work

environment claim. Plaintiff initially complained about Moore's conduct on May 10, 2011, and the investigation into the matter concluded on August 2, 2011. (Def. Stmt. at ¶¶ 10-18; Pl. Stmt. at ¶¶ 10-18). As discussed above, under the applicable limitations period, Plaintiff may only pursue claims that arose after October 12, 2011. Moreover, while "consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory period, is permissible for the purpose of assessing liability, so long as an act contributing to that hostile work environment takes place within the statutory time period," *Early v. Wyeth Pharm., Inc.*, 603 F. Supp. 2d 556, 572 (S.D.N.Y. 2009), Plaintiff has alleged no facts to suggest that her allegations regarding Moore are related to her hostile work environment allegations that occurred during the relevant time period. Accordingly, the Court finds that Plaintiff's allegations regarding Moore do not support a hostile work environment claim.

Turning to Plaintiff's allegations from within the statutory period, the Court finds Plaintiff has met her initial burden of making a *prima facie* showing of a hostile work environment. Plaintiff testified that her co-worker Kelly made frequent and pervasive hostile and offensive comments, including calling her a bitch, tracking her use of the restroom, and stating that she was incapable of performing her job and that a "girl" should not be in the garage. (*See* Dkt. 37-6 at 59-63). According to Plaintiff's deposition testimony, Kelly's inappropriate comments occurred on a daily basis. (*See* Dkt. 37-6 at 59). A trier of fact could reasonably conclude that Kelly's daily comments and tracking of Plaintiff's restroom use pervaded her work environment and altered the conditions of her employment. *See Piston v. Cty. of Monroe*, No. 08-CV-6435P, 2012 WL 4490652,

at *10 (W.D.N.Y. Sept. 27, 2012) (repeated inappropriate comments, including calling the plaintiff a bitch on one occasion, could constitute "conduct sufficiently severe and pervasive to constitute a gender-based hostile work environment").

The Court notes that Plaintiff has also made other allegations related to her work environment, including that she was required to move her desk to the garage and that she was given labor-intensive work assignments. However, these allegations do not rise to the level of altering the conditions of Plaintiff's employment or creating an abusive working environment. The evidence in the record indicates that Plaintiff only spotted mice in her work space one time. "Isolated incidents or episodic conduct will not support a hostile work environment claim." *Richardson v. N.Y. State Dept. Corr. Serv.*, 180 F.3d 426, 440 (2d Cir. 1999). Moreover, the fact that Plaintiff allegedly received labor-intensive job assignments does not demonstrate that Plaintiff faced discriminatory treatment because Plaintiff has not produced evidence to support the conclusion that male truck drivers received easier assignments. To the contrary, the work orders in the record indicate that they are for Plaintiff and the rest of the garage crew. (*See* Dkt. 53-4 at 14-18). "While facially neutral incidents may be considered among the totality of the circumstances . . . in any hostile work environment claim, there must be a circumstantial or other basis for inferring that incidents sex-neutral on their face were in fact discriminatory." *Cristofaro v. Lake Shore Cent. Sch. Dist.*, 473 F. App'x 28, 30 (2d Cir. 2012) (internal quotations omitted). There is no such basis here. Accordingly, the viability of Plaintiff's hostile work environment claim turns on whether Kelly's

misconduct can be imputed to Defendant. The Court concludes that it cannot, for the reasons discussed below.

Because Kelly was Plaintiff's co-worker, and not a supervisor, Defendant is only liable for his creation of a hostile work environment if it was negligent in controlling working conditions. *See Vance*, 570 U.S. at 424. The record in this case does not support such a conclusion. To the contrary, the uncontroverted evidence shows that Defendant treated Plaintiff's complaints against Kelly seriously. (*See* Dkt. 42 at 33). Willis investigated Plaintiff's complaints promptly and took corrective action. (*Id.*). After Plaintiff's first complaint concerning Kelly, Willis visited the workplace and met with both Plaintiff and Kelly. (Dkt. 37-3 at ¶¶ 19-23). Willis instructed Kelly to speak to Plaintiff only about work-related matters. (*Id.* at ¶ 22). When Plaintiff later emailed Willis about Kelly calling her a "bitch," Willis requested the names of witnesses and held a meeting with Kelly, Nesci, and Goshen about Plaintiff's complaint. (*Id.* at ¶ 28). Approximately three weeks later, Willis sent a memo to Kelly stating that Plaintiff had provided written documentation that Kelly was still complaining about and discussing Plaintiff with other co-workers and recommending that Kelly receive disciplinary action. (*Id.* at ¶ 30). Willis provided Plaintiff with a copy of that memo. (*Id.*).

Where supervisors are not involved in misconduct, complaints are swiftly investigated, and disciplinary action is taken, wrongdoing by co-workers cannot be imputed to an employer. *See Curtis v. Citibank, N.A.*, 70 F. App'x 20, 22 (2d Cir. 2003) (affirming grant of summary judgment where employer swiftly investigated and punished those involved in circulating offensive email, because misconduct could not be imputed

to the employer under those circumstances). Moreover, while Plaintiff claims that Kelly's misconduct continued after issuance of the memo, she acknowledges that she made no further complaints to Defendant after that time. (Def. Stmt. at ¶ 32; Pl. Stmt. at ¶ 32). Defendant cannot be held liable for misconduct of which it was not aware and had no opportunity to remedy. *See Ford v. N.Y.C. Dep't of Health & Mental Hygiene*, 545 F. Supp. 2d 377, 394 (S.D.N.Y. 2008). As a result of the foregoing reasons, there are no disputed issues of material fact concerning the hostile work environment claim. Therefore, Defendant's motion for summary judgment is granted with respect to Plaintiff's hostile work environment claim.

## IV.    Pay Discrimination Claim

Plaintiff also claims that she was paid different wages on the basis of her gender. To establish a valid claim for gender-based wage discrimination under Title VII, a plaintiff must demonstrate "a disparate impact from use of a facially neutral employment practice . . . or present evidence of intentional sex-based wage discrimination." *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 528 (2d Cir. 1992). Plaintiff has failed to satisfy either of these standards in this case. First, Plaintiff does not allege the existence of a facially neutral employment practice that disparately impacted her, nor does the record evidence indicate that such a practice existed.

Second, Plaintiff's intentional discrimination theory—that she was denied a promotion to Grade 7 pay when males with less seniority received promotions (*see* Dkt. 1 at ¶¶ 44-45)—is contradicted by the evidence of record. Plaintiff alleges that her male co-workers received their "promotion" to Grade 7 pay on January 23, 2012, and that she

requested a promotion to Grade 7 on February 21, 2012. (Dkt. 1 at ¶¶ 44-45). However, Plaintiff admits that she was granted a pay variance in March 2012, based on the recommendation of her supervisor. (Def. Stmt. at ¶ 49; Pl. Stmt. at ¶ 49). Like Plaintiff, the male co-workers who received Grade 7 pay had received pay variances. (Def. Stmt. at ¶ 50; Pl. Stmt. at ¶ 50). Thus, the undisputed evidence demonstrates that Plaintiff was treated substantially the same as her male workers with respect to the allegations regarding Grade 7 pay.

At oral argument on the instant motion, Plaintiff's counsel suggested that Plaintiff's pay discrimination claim is based on Plaintiff's alleged downward departure from Grade 7 pay sometime after 2012. However, there are no allegations or arguments based on that incident in the record or the parties' papers, nor has Plaintiff produced or identified any evidence to support the claim that she was downwardly departed and her male co-workers were not. Plaintiff's counsel also confirmed that Plaintiff is not pursuing a pay discrimination claim based on her allegations that male colleagues were upgraded to Grade 5 pay in 2011 and Plaintiff was refused an upgrade. Any claim based on those allegations would be time-barred in any event.

Based on the instant facts, the Court concludes that no reasonable trier of fact could conclude that Plaintiff received disparate pay on the basis of her gender. The evidence of record instead shows that Plaintiff received a pay variance when she requested it, at roughly the same time as her male co-workers. Plaintiff's belated assertion that she was subsequently downwardly departed from Grade 7 cannot sustain her claim, because she has failed to present any evidence to support it. *See Maier-Schule*

*GMC, Inc. v. Gen. Motors Corp. (GMC Truck & Bus Grp.)*, 154 F.R.D. 47, 57 (W.D.N.Y. 1994) ("The summary judgment inquiry . . . scrutinizes the plaintiff's case to determine whether the plaintiff has proffered sufficient proof, in the form of admissible evidence, that could carry the burden of proof of his claim at trial.") (internal quotation omitted). Thus, Defendant's motion for summary judgment is granted with respect to Plaintiff's pay discrimination claim.

## V.  **Retaliation**

Finally, the Court must consider whether a reasonable jury could find for Plaintiff with respect to her claim of retaliation. Title VII contains an anti-retaliation provision that makes it unlawful "'for an employer to discriminate against any . . . employee[] or applicant[] . . . because [that individual] opposed any practice' made unlawful by Title VII or 'made a charge, testified, assisted, or participated in' a Title VII investigation or proceeding." *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (quoting 42 U.S.C. § 2000e-2(a)). Retaliation claims are evaluated pursuant to a three-step burden-shifting analysis. *Id.* First, the plaintiff must establish a *prima facie* case by showing: "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Id.* "The plaintiff's burden in this regard is *de minimis*, and the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Id.*

If the plaintiff sustains her initial burden, a presumption of retaliation arises and the defendant must then "articulate a legitimate, non-retaliatory reason for the adverse employment action." *Id*. If the defendant can do so, "the presumption of retaliation dissipates and the employee must show that retaliation was a substantial reason for the adverse employment action." *Id*. A plaintiff can sustain that burden by proving that "a retaliatory motive played a part in the adverse employment actions even if it was not the sole cause." *Id*.

Actions are "materially adverse" for purposes of a retaliation claim if they are "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Hicks*, 593 F.3d at 165. In *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006), the Supreme Court considered whether, in a Title VII retaliation case, there must be a link between the challenged retaliatory action and the terms, conditions, or status of employment, as is required under the antidiscrimination provision of Title VII. *Id*. at 61. The Supreme Court noted that the anti-retaliation provision does not contain the same limiting language as the substantive provision. Title VII's core antidiscrimination provision provides:

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual *with respect to his compensation, terms, conditions, or privileges of employment*, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way *which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his*

*status as an employee*, because of such individual's race, color, religion, sex, or national origin.

§ 2000e–2(a) (emphasis added).  Meanwhile, the anti-retaliation provision provides:

It shall be an unlawful employment practice for an employer *to discriminate against* any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

§ 2000e–3(a) (emphasis added).  Based on the different language used in the two provisions, the Supreme Court concluded that "the antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment." *White*, 548 U.S. at 64.  Even so, the Second Circuit has held that "petty slights and minor annoyances" are not materially adverse for purposes of a Title VII retaliation claim.  *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 24-25 (2d Cir. 2014).

When deciding a summary judgment motion as to a Title VII retaliation claim, in addition to considering alleged acts of retaliation on their own, courts must consider them in the aggregate, "as even minor acts of retaliation can be sufficiently 'substantial in gross' as to be actionable." *Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 225 (E.D.N.Y. 2014) (quoting *Hicks*, 593 F.3d at 165); *see also Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 227 (2d Cir. 2006) ("[T]his ridicule was considered a part of a larger campaign of harassment which though trivial in detail may have been substantial in gross, and therefore was actionable." (internal quotation marks omitted)).

In this case, Defendant argues that Plaintiff has not alleged a materially adverse employment action and that the only potentially adverse action that Plaintiff has alleged is the rejection of her application for the head gardener position, for which it has articulated a non-retaliatory rationale. (Dkt. 42 at 26-27). According to Defendant, Plaintiff's other allegations do not rise to the level of materially adverse actions, and Defendant is therefore entitled to judgment in its favor on Plaintiff's retaliation claim.

The Court agrees with Defendant that Plaintiff's rejection for the head gardener position was not retaliatory. As discussed above, even if Plaintiff could establish a *prima facie* case, Defendant had a legitimate, non-retaliatory reason for choosing to hire Anderson for that position rather than Plaintiff, and Plaintiff has failed to raise a material issue of fact that the offered justification was pretextual. The record evidence (which, as the Court previously noted, does not even identify the ultimate decisionmakers regarding the head gardener position) is insufficient to support the conclusion that Plaintiff was denied the head gardener position for retaliatory reasons.

However, the Court agrees with Plaintiff that although the other alleged wrongful conduct to which she was subjected may have been minor when viewed in isolation, it was sufficiently "substantial in gross," *Hicks*, 593 F.3d at 165, to sustain a retaliation claim. The record contains numerous examples of mistreatment following Plaintiff's complaints to Willis and the EEOC that, taken together, are sufficient to survive summary judgment with respect to Plaintiff's retaliation claim. These examples include being forced by her supervisor Goshen to move her desk into an area where there were mice present, her supervisor Nesci's refusal to speak to Plaintiff when he freely spoke

with other employees, being required to perform tasks in an unreasonable amount of time, and being yelled at to the point that it made her feel sick. The Court finds that, considered in the aggregate, this mistreatment could very well "dissuade a reasonable worker from making or supporting a charge of discrimination." *Hicks*, 593 F.3d at 169.

The Court further concludes that the proffered evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive. The incidents were close in time to Plaintiff's protected activity—for example, roughly two months elapsed between Plaintiff's September 2011 complaint against Kelly, Goshen's insistence that she move her desk and refusal to speak to Plaintiff without Nesci present, and Nesci's failure to respond to Plaintiff's attempts to discuss the issue with him. Similarly, the incident in which Vitali yelled at Plaintiff so severely that she felt ill was in direct response to Plaintiff having reported to Vitali that she felt she was being treated like a second-class citizen. (*See* Dkt. 53-4 at 10).[3] "[T]emporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a prima facie case of retaliation under Title VII." *Fraser v. MTA Long Island Rail Rd.*, 307 F. Supp. 3d 105, 116 (E.D.N.Y. 2018) (internal quotation omitted). The Court thus finds that Plaintiff has met her *de minimus* burden of establishing a *prima facie* case of retaliation.

---

[3] While this incident happened in September 2011, outside the limitations period, it is part of a pattern of treatment and is relevant evidence of the alleged retaliatory motivations of Plaintiff's supervisors. *See Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 176 (2d Cir. 2005) ("relevant background evidence, such as . . . earlier decisions typifying the retaliation involved, may be considered to assess liability on the timely alleged act").

Defendant has not proffered any legitimate, non-retaliatory reasons for the alleged mistreatment described above, having limited its argument to contending that the mistreatment did not rise to the level of an adverse employment action. Accordingly, the Court need not consider whether any such reasons were pretextual, and the Court's inquiry into whether summary judgment is warranted is ended.

For the foregoing reasons, Defendant's motion for summary judgment is denied with respect to Plaintiff's retaliation claim. However, at the trial of this matter, Plaintiff shall not be permitted to argue that the denial of the head gardener position was retaliatory, for the reasons discussed above, but shall be limited to relying on her other allegations of misconduct.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment (Dkt. 37) is granted in part and denied in part. In particular, Defendant's motion is denied with respect to Plaintiff's retaliation claim but is granted with respect to all other claims.

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

DATED:     September 17, 2018
           Rochester, New York